IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLORADO

Criminal Case No. 1:22-CR-226 (DDD)

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RICHER BRIYAN VALLE-RAUDALES,

    Defendant.

---

**RICHER BRIYAN VALLE-RAUDALES'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE/DEPARTURE TO A SENTENCE OF EIGHT MONTHS IMPRISONMENT**

---

Pursuant to the sentencing factors outlined in 18 U.S.C. § 3553(a), and the plea agreement he reached with the government, Docket Entry Number ("DE") 21:1 – 2, Richer Briyan Valle-Raudales respectfully request the Court impose a sentence of eight months imprisonment.[1] An eight month sentence is appropriate because it reflects the nature and circumstances of the instant offense, the seriousness of the offense, and the need to promote respect for the law. Further, the nature and circumstances of the instant offense are not particularly aggravated. Mr. Valle-Raudales reentered the United States to both avoid physical danger and to seek a better opportunity to provide for himself and to support his family in the United States. For all of the reasons detailed below, the Court should impose a time-served sentence.

---

[1] The government and Mr. Valle-Raudales both agreed to request a sentence of eight months in this case, to run consecutive to a four-month sentence imposed in Case Number 1:22-CR-240 (DDD), for a total sentence of twelve months imprisonment.

I.    THE NATURE OF THE OFFENSE

The origins of 8 U.S.C. § 1326, under which Mr. Valle-Raudales stands convicted, are grounded in anti-Hispanic racism and the early-20th century fad of eugenics. This shameful and uncomfortable history is directly relevant to the Court's consideration of the nature and circumstances of the offense, the seriousness of the offense, and the need to promote respect for a law that seeks to criminalize individuals based largely on their "undesirable" race. The Court should also consider the disparate criminalization of almost exclusively Hispanic individuals under § 1326, while unauthorized immigrants from Canada and Europe who have overstayed their visas rarely, if ever, face criminal penalties. The Court is required to consider each of these factors under § 3553(a) and has discretion to consider policy arguments as necessary to impose a sentence "sufficient, but not greater than necessary." *See Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *Spears v. United States*, 555 U.S. 261, 264 (2009).

A.    A Stark Statistical Picture.

In fiscal year 2020, 19,654 people were convicted of illegal reentry pursuant to 8 U.S.C. § 1326 — a number that represented 82.7% of all immigration convictions nationwide.[2] More than 99% of the people convicted under § 1326 were Hispanic.[3] In other words, of the 19,654 people convicted of unlawful reentry, only roughly 177 were not Hispanic. These statistics are not the result of historical accident. Section 1326 was birthed, passed, and faithfully implemented to target and punish non-white immigration offenders.[4] These laws continue to be enforced to the same effect

---

[2] United States Sentencing Commission Quick Facts, "Illegal Reentry" (May 2021), attached hereto as Exhibit "A."
[3] *Id.*
[4] *See* Ian McDougall, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, PROPUBLICA, June 19, 2018, https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy (last accessed July 6, 2021); Kelly Lytle Hernandez, *How Crossing the US-Mexico Border Became a Crime*, THE CONVERSATION, April 30, 2017, https://theconversation.com/how-crossing-the-us-mexico-border-became-a-crime-74604 (last

today as they were when they were enacted nearly a century ago — virtually unquestioned or challenged. It is telling that no criminal law counterpart exists for people who overstay their visas, a group that is also "illegally" in this country, but whose top countries of origin are Canada (est. 93,035 Fiscal Year 2016) and countries in Europe (est. 123,729 Fiscal Year 2016).[5]

On the other hand, more than 90% of those prosecuted for illegal reentry were Hispanic. In fiscal year 2019, of the 22,077 illegal reentry cases reported, 99% of the defendants were Hispanic.[6] In fiscal year 2018, of the 18,241 illegal reentry cases reported, 98.8% of the defendants were Hispanic.[7] In fiscal year 2017, of the 15,767 illegal reentry cases reported, 98.9% of defendants were Hispanic.[8] In fiscal year 2016, of the 15,744 illegal reentry cases reported, 98.7% of the defendants were Hispanic.[9] In fiscal year 2015, of the 15,715 cases reported, 98.7% of defendants were Hispanic.[10] In fiscal year 2014, of the 16,556 cases reported, 98.3% of defendants were Hispanic.[11]

---

accessed July 6, 2021); Libby Watson, *How Crossing the Border Became a Crime*, SPLINTER NEWS, June 29, 2018, https://splinternews.com/how-crossing-the-border-became-a-crime-1827160001 (last accessed July 6, 2021).

[5] Jeffrey S. Passel and D'Vera Cohn, *Homeland Security Produces First Estimate of Foreign Visitors to U.S. Who Overstay Deadline To Leave*, PEW RESEARCH CENTER, February 3, 2016, http://www.pewresearch.org/fact-tank/2016/02/03/homeland-security-produces-first-estimate-of-foreign-visitors-to-u-s-who-overstay-deadline-to-leave/ (last accessed July 6, 2021).

[6] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2019), attached hereto as Exhibit "B."

[7] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2018), attached hereto as Exhibit "C."

[8] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2017), attached hereto as Exhibit "D."

[9] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2016), attached hereto as Exhibit "E."

[10] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2015), attached hereto as Exhibit "F."

[11] United States Sentencing Commission Quick Facts, "Illegal Reentry" (Fiscal Year 2014), attached hereto as Exhibit "G."

In fiscal year 2013, out of 18,498 illegal reentry cases reported, 98.1% of defendants were Hispanic.[12] The numbers speak for themselves.

### B. Mr. Valle-Raudales's Background.

Mr. Valle-Raudales life has been a constant struggle. From the time he was young, he has had issues with both food security and shelter. His life in Honduras was also mired by gang violence that has plagued the country (making it one of the deadliest countries in the world). Mr. Valle-Raudales left home to find work to provide for his a six-year-old child in Honduras. He also has a one-year-old daughter here that he provides for. Mr. Valle-Raudales's family is attempting to relocate to Spain and he intends to join them once he is released from custody and removed.

## II. A SENTENCE OF EIGHT MONTHS IS APPROPRIATE

The Supreme Court has acknowledged that "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101; *see also Gall v. United States*, 552 U.S. 38, 59 (2007) (finding a sentence outside the Guidelines to be reasonable). In fact, the Supreme Court has specifically clarified that "district courts are entitled to reject and vary categorically" from the Guidelines "based on a policy disagreement with those Guidelines." *Spears*, 555 U.S. at 266 (emphasis added).

When sentencing a criminal defendant under § 1326, the racialized historical context of the statute, its path to passage and the statistical evidence of its racially disparate execution throughout the years is relevant to the appropriate sentence. The § 3553(a) factors, informed by the origins of illegal reentry law, mandate a sentence far below the Guideline range calculated by the government.

---

[12] United States Sentencing Commission Quick Facts "Illegal Reentry" (Fiscal Year 2013), attached hereto as Exhibit "H."

### A. Seriousness of the Offense.

The history and rhetoric around immigration offenses has urged their treatment as more serious than the conduct warrants. The zealous enforcement of a "zero tolerance" policy at the border – in play at the time Mr. Valle-Raudales was taken into custody – relies heavily upon the same fervent racist vitriol that underpinned the original illegal reentry law. Indeed, then President Trump's fearmongering about "stone cold criminals" from Mexico and Central America attempting to enter the United States echoes the racial vitriol of Secretary of Labor James Davis, who referred to Mexican men as "rat men," nearly a century ago. The past century of anti-Hispanic rhetoric has unfairly portrayed undocumented Hispanic immigrants as inherently "criminal." And, consequently, this rhetoric has disproportionately inflated the perceived seriousness of illegal reentry.

The seriousness of the offense in this case cannot be divorced from the fact that illegal reentry *is* a status offense. The first of the four elements the government must prove is that the defendant is an "alien." Moreover, unlike other crimes that include "status" as an element (such as being a felon in possession of a firearm) nothing about *any* of the elements or conduct of illegal reentry suggests that the offender presents a heightened risk to society, unless we continue to implicitly accept the same logic that led to the law's passage: that being a non-white alien is inherently "dangerous" or undesirable; that being Hispanic is a predicate to criminality.

Accordingly, the seriousness of the offense weighs in favor of an eight-month sentence.

### B. The Need to Avoid Unwarranted Disparities.

The illegal reentry prosecution statistics paint a stark picture. While the government may argue that the § 3553(a) focuses on the need to avoid unwarranted disparities in sentencing, not enforcement, the fact that almost *exclusively* Hispanic people are convicted under § 1326 cannot be ignored. At the core of the dramatic racial disparity in criminalization of unauthorized Hispanic immigrants, as compared to unauthorized non-Hispanic immigrants, is more than just coincidence.

This disparity is the result of an intentional decision made by legislators to criminalize "undesirable" immigrants, based on their belief of racial inferiority, and *not* to create any criminal law counterpart for other immigrants, such as those who overstay their visas. As a result, Hispanic immigrants not only suffer disparate sentences, relative to the non-existent sentences served by non-Hispanic immigrants, but also the punitive, life-long consequences of a criminal conviction.

In *Kimbrough*, the Supreme Court expressly authorized district courts to vary below-Guidelines to remedy the racial disparities in punishment between crack and powder cocaine. The prevailing logic was that the drug quantity ratio for crack cocaine exponentially increased the amount of time a defendant charged with crack cocaine offenses would face, and because Black people were more likely to be convicted of crack cocaine offenses, the Guidelines resulted in significant racial disparities. But, notably, this disparity was not due to Black people using crack more than white or Hispanic people. In fact, although more than 80% of the defendants sentenced for crack offenses were Black, more than 66% of crack users were white or Hispanic.[13] White people were simply less likely to be prosecuted, more likely to be acquitted if prosecuted, and even if convicted, less likely to be sent to prison.[14] Thus, the disparity between crack and powder cocaine sentences under the Guidelines was compounded by racial disparities at earlier junctures in the criminal justice system.

Similarly, because illegal reentry laws were designed to punish only "undesirable" Hispanic immigrants, and because present-day enforcement continues to faithfully fulfill that purpose, people like Mr. Valle-Raudales are more likely to be prosecuted — by a factor of 99 to 1 — and consequently

---

[13] Marc Mauer, *The Disparity on Crack-Cocaine Sentencing*, THE BOSTON GLOBE, July 5, 2006, archive.boston.com/news/globe/editorial_opinion/oped/articles/2006/07/05/the_disparity_on_crack_cocaine_sentencing/ (last accessed July 6, 2021).

[14] Gabriel J. Chin, *Race, The War on Drugs, and the Collateral Consequences of Criminal Conviction*, 6 J. GENDER RACE & JUST. 253, 266 (2002).

face time in prison as compared to non-Hispanic immigrants. The Court should mitigate this disparity by granting Mr. Valle-Raudales a downward variance to a time-served sentence.

Further, the requested sentence would be in line with the national average sentence imposed for an illegal reentry offense. The average sentence imposed for a violation of § 1326 has steadily decreased over the past ten years. In, 2020 the average sentence imposed was eight months;[15] in 2019, it was nine months;[16] in 2018, it was ten months;[17] in 2017, it was twelve months;[18] in 2016, it was fourteen months;[19] in 2015, it was sixteen months;[20] in 2014, it was seventeen months;[21] and in 2013, it was eighteen months.[22]

### C. Need to Promote Respect for the Law and Provide Just Punishment.

Illegal reentry is, at its core, a trespass offense. Mr. Valle-Raudales's trespass in the United States has been criminalized as a result of racial animus. While the racial animus underlying § 1326 is historical, the present-day enforcement of the law against almost exclusively Hispanic people — many of whom, like Mr. Valle-Raudales, have worked, built families, and otherwise contributed to society in the United States — is entirely consistent with the original intent of the law. While other laws stemming from similarly racist ideas have since been abandoned and relegated to the ash heap of history, the criminalization of illegal reentry has not. The racist history of illegal reentry cannot be ignored.

The racism and xenophobia embedded in U.S. immigration laws at the turn of the 19th century laid the groundwork for the criminalization of illegal reentry. At the end of the 19th century,

---

[15] Exhibit A.
[16] Exhibit B.
[17] Exhibit C.
[18] Exhibit D.
[19] Exhibit E.
[20] Exhibit F.
[21] Exhibit G.
[22] Exhibit H.

Congress passed a series of laws aimed at stemming immigration from China, culminating in the Chinese Exclusion Act of 1882. Pub. L. No. 47-126, 22 Stat. 58. The legislative history of the Chinese Exclusion Act relied upon concerns about maintaining the racial purity of the United States that echo the legislative history of illegal reentry. Senator Henry M. Teller advocated for the Chinese Exclusion Act as a defense of white supremacy: "The Caucasian race has a right, considering its superiority of intellectual force and mental vigor, to look down upon every other branch of the human family. . . . We are the superior race today." 13 Cong. Rec. 1645, 1645 (1882). But, as the Supreme Court held in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), choosing to selectively exclude noncitizens based on race is fundamentally different from the criminal prosecution of noncitizens based on race.

Less than two decades after Senator Blease's illegal reentry law was passed in 1929, another act of trespass based on race was criminalized. Beginning in May 1942, any person of Japanese ancestry who "enter[ed]" or "remain[ed] in" in violation of an Executive Order would be "guilty of a misdemeanor and upon conviction shall be liable to a fine of not to exceed $5,000 or to imprisonment not for more than one year, or both." *Korematsu v. United States*, 323 U.S. 214, 216 (1944). In *Korematsu*, the Supreme Court upheld a trespass conviction under this provision in what has been broadly recognized as one of the most shameful decisions in our country's jurisprudential history. Justice Murphy dissented, noting that "[r]acial discrimination in any form and in any degree has no justifiable part whatever in our democratic way of life." *Id.* at 242. But although Justice Murphy dissented "from this legalization of racism," Fred Korematsu was neither the first nor the last person of Japanese descent criminally convicted as a result of anti-Japanese animus during World War II.

Some of this shameful history has been redressed. The Immigration and Nationality Act of 1965 repealed racially-motivated national-origins quotas, which had been in place since the 1920s.

But the Act did not repeal the 1929 illegal reentry law. Over the past several decades, jurists and legislators have revisited and confronted the racist legacy of *Korematsu*. In 1980, Congress established a commission to investigate the history of Japanese internment camps, conducted extensive interviews, and issued a report declaring the interment a "grave injustice" motivated by "racial prejudice, war hysteria and the failure of political leadership."[23] In 1988, President Reagan signed the Civil Liberties Act of 1988, authorizing $1.6 billion in reparations for Japanese-American survivors of internment.[24] And in 2018, the Supreme Court expressly overruled *Korematsu*, holding that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

Yet the even more dated, similarly racist origins of illegal reentry—which was similarly designed to criminalize people of a certain race for violating civil immigration laws—remain virtually unquestioned. Instead, the government continues to dramatically expand enforcement of § 1326, reaching a new record of 22,077 cases prosecuted in fiscal year 2019.[25] In 2020, immigration-related prosecutions "accounted for the largest single group of offenses" federally prosecuted nationwide.[26]

Section 3553(a) requires the Court to evaluate the need to promote respect for the law and provide just punishment for the instant offense. Should the Court impose a longer sentence in prison

---

[23] Bilal Qureshi, *From Wrong to Right: A U.S. Apology for Japanese Internment*, Nat'l Public Radio (Aug. 9, 2013), https://www.npr.org/sections/codeswitch/2013/08/09/210138278/japanese-internment-redress (last accessed July 6, 2021); Isabella Rosario, *The Unlikely Story Behind Japanese Americans' Campaign for Reparations*, Nat'l Public Radio (Mar. 24, 2020), https://www.npr.org/sections/codeswitch/2020/03/24/820181127/the-unlikely-story-behind-japanese-americans-campaign-for-reparations (last accessed July 6, 2021).
[24] *Id.*
[25] Exhibit B. Notably, this number excludes criminal prosecutions under 8 U.S.C. § 1325.
[26] 2020 Annual Report and Sourcebook of Federal Sentencing Statistics, at 7, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf (last accessed July 6, 2021).

to promote respect for a law grounded in racist and eugenicist beliefs about the inferiority of Hispanics and enforced 99% of the time against a single racial group, when the person reenters the United States to flee violence and home and to provide for his children? Certainly not, even if illegal reentry has not yet been repealed or found unconstitutional.[27] Instead, the racist history and racially disparate enforcement of § 1326 support a variance down to the requested sentence.

### D. Nature and Circumstances of the Offense.

Mr. Valle-Raudales's conduct in the instant offense did not involve any allegation of violence, drugs, terrorism, or any other aggravating factor that might ordinarily warrant a higher sentence under the Sentencing Guidelines. Nor did the instant offense involve any allegation that Mr. Valle-Raudales was returning to the United States to engage in any other criminal activity. Instead, Mr. Valle-Raudales returned to the United States to flee violence at home and provide for his family. Most, if not all of us, would be similarly motivated.

### E. An Eight Month Sentence is Appropriate Because Mr. Valle-Raudales Will Not Receive the Rehabilitative Benefits of a Longer Custodial Sentence that U.S. Citizens Incarcerated in BOP Facilities Receive.

Under Bureau of Prisons policy, Mr. Valle-Raudales is not eligible for many of the programs and reentry resources designed to ensure that people leaving prison are able to get back on their feet—to give them a fair shot at success on the outside.[28] For example, the Bureau of Prisons has

---

[27] The New Way Forward Act, which was introduced into Congress on December 10, 2019, would repeal both 8 U.S.C. § 1325 and § 1326. *See* New Way Forward Act, H.R. 5383, 116th Cong. § 601 (2019).

[28] Jacob Schuman, *Federal Prisons Don't Even Try to Rehabilitate the Undocumented*, THE MARSHALL PROJECT, Oct. 17, 2017, https://www.themarshallproject.org/2017/10/17/federal-prisons-don-t-even-try-to-rehabilitate-the-undocumented (last accessed July 6, 2021); *see also, e.g.*, Federal Bureau of Prisons Program Statement § 550.553 Residential Drug Abuse Treatment Program, Implementing Instructions, https://www.bop.gov/policy/progstat/5330_011.pdf, at p. 23 (last accessed July 6, 2021) ("A deportable inmate is unqualified for the RDAP because he or she cannot participate in the transitional drug abuse treatment component because he or she is not eligible for RRC placement.").

excluded individuals subject to ICE detainers from drug treatment and job training rehabilitation programs. *See McLean v. Crabtree*, 173 F.3d 1176, 1184 (9th Cir. 1999) (rejecting argument that exclusion of deportable aliens from rehabilitative programs violates prisoner's equal-protection rights). Mr. Valle-Raudales's ineligibility for rehabilitative programs while in BOP custody weighs in favor of a time-served sentence. As District Judge Jack Weinstein of the Eastern District of New York has noted, "[r]ehabilitative concerns weigh especially strongly against a term of imprisonment where the defendant is subject to deportation upon completion of a sentence." *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, *10 (E.D.N.Y. Sept. 22, 2014).

### III. A TERM OF SUPERVISED RELEASE IS NOT RECOMMENDED UNDER THE GUIDELINES

The Guidelines specifically state that "[t]he court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment." U.S.S.G. § 5D1.1(c). A term of supervised release is not required by statute, and Mr. Valle-Raudales will be removed from the United States after he has served his sentence. Accordingly, a term of supervised release is not recommended. *See* U.S.S.G. § 5D1.1 n.5 ("Unless [a defendant without legal status in the United States] legally returns to the United States, supervised release is unnecessary. If such a defendant illegally returns to the United States, the need to afford adequate deterrence and protect the public ordinarily is adequately served by a new prosecution."). The significant, and ever-mounting, penalties that await Mr. Valle-Raudales should he ever return to the United States in the future are more than sufficient to deter him from violating U.S. immigration laws again.

## IV.     CONCLUSION

For the foregoing reasons, the Court should impose a sentence of eight months, with no supervision to follow.

Respectfully submitted, this 10th day of February, 2023.

>VIRGINIA L. GRADY
>Federal Public Defender
>
>*s/ Jared Scott Westbroek*
>JARED SCOTT WESTBROEK
>Assistant Federal Public Defender
>633 17th Street, Suite 1000
>Denver, CO  80202
>Telephone:  (303) 294-7002
>Email:  jared_westbroek@fd.org
>Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2023, I electronically filed the foregoing **RICHER BRIYAN VALLE-RAUDALES'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE/DEPARTURE TO A SENTENCE OF EIGHT MONTHS IMPRISONMENT** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Albert C. Buchman, Assistant United States Attorney
Email: al.buchman@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Richer Briyan Valle-Raudales via U.S. Mail

*s/ Jared Scott Westbroek*
JARED SCOTT WESTBROEK
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email:  jared_westbroek@fd.org
Attorney for Defendant